# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| BANK RHODE ISLAND,<br>Appellant-Creditor,<br><br>vs.<br><br>PAWTUXET VALLEY PRESCRIPTION<br>& SURGICAL CENTER, INC.,<br>Appellee-Debtor. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 08-14S |

ON APPEAL FROM AN ORDER OF THE
UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND
(BK. No. 07-11767; Chapter 11)

---

BRIEF OF APPELLANT-CREDITOR
BANK RHODE ISLAND

---

Robert D. Wieck, Esq. (#1739)
Attorney Denean M. Russo (#5043)
Counsel for Appellant-Creditor
MacADAMS WIECK DeLUCA & GEMMA, INC.
101 Dyer Street, Suite 400
Providence, RI 02903
Telephone (401) 454-8700
Fax (401) 454-8755

Date: February 12, 2007

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ........................................................................iv

I. JURISDICTIONAL STATEMENT......................................................1

II. ISSUES PRESENTED FOR REVIEW ..............................................1

III. STANDARD OF REVIEW ................................................................1

IV. STATEMENT OF THE CASE ..........................................................2

A. PERTINENT BACKGROUND & TRAVEL OF THE CASE ......................2

B. EVIDENCE IN THE RECORD RELATING TO THE VALUE OF THE DEBTOR'S ASSETS (the Collateral Securing the Indebtedness to the Bank) ..........................................................................5

C. EVIDENCE IN THE RECORD RELATING TO THE DEBTOR'S BUSINESS OPERATIONS ..........................................................6

1. Debtor's Financial Reports ..........................................................6

2. Evidence Pertaining to Synagis ....................................................9

D. THE BANKRUPTCY COURT'S DECISION ......................................10

V. ARGUMENT ..................................................................................10

A. APPLICABLE LAW ..........................................................................10

B. THE BANKRUPTCY COURT ERRED IN ALLOWING THE DEBTOR TO OBTAIN DEBTOR-IN POSSESSION SECURED FINANCING UNDER §364(d) AS A RESULT OF ITS FINDING THAT NO ADEQUATE PROTECTION TO THE BANK WAS NECESSARY BECAUSE THE BANK HAD A SUFFICIENT "EQUITY CUSHION" IN THE COLLATERAL ASSETS OF THE DEBTOR ......................................................................13

1. A Liquidation Value Should Have Been Applied to All of the Debtor's Assets Securing the Indebtedness, and When the Proper Standard of Valuation (Liquidation Value) is Utilized in the §364(d) Adequate Protection Analysis, There is No Equity Cushion ..................13

PAGE

2. The Overwhelming Evidence Established That the Debtor Cannot Maintain Stability During its Attempt to Reorganize ..........................14

3. The Debtor's Proposed Financing Analysis Was Misleading and the Inherent Additional Risk to the Bank Was Unjustified ..............15

VI. CONCLUSION ..........................................................................16

## TABLE OF AUTHORITIES

CASES PAGE

*In re First South Savings Association,* 820 F.2d 700 (5th Cir. 1987) ..............................11

*In re LaRoche*, 969 F.2d 1299 (1st Cir. 1992) ..................................................1

*In re Mosello*, 195 B.R. 277 (Bankr.S.D.N.Y. 1996) ................................11,12

*In re Singleton,* 284 B.R. 322 (D.R.I. 2002) ..................................................1

*In re Slater Health Center, Inc.*, 306 B.R. 20 (Bankr.D.R.I. 2004) ..............................2

*In re Stony Creek Technologies, LLC*, 364 B.R. 882 (Bankr.E.D.Pa. 2007) ................11,12,14

*In re Swedeland Development Group, Inc.*, 16 F.3d 552 (3d Cir. 1994) ........................12

*In re Timber Products, Inc.*, 125 B.R. 433 (Bankr.W.D.Pa. 1991) ..........................12,14

*In re Windsor Hotel, LLC*, 295 B.R. 307(Bankr.C.D.Ill. 2003) ..................................12

STATUTES AND RULES

11 U.S.C. §364(d) ........................................................................... *passim*

11 U.S.C. §364(d)(1)(B) ..........................................................11,12,13,14

28 U.S.C. §158(a)(1).............................................................................1

Federal Rule of Bankruptcy Procedure 8001(a) ..................................................1

Federal Rule of Bankruptcy Procedure 8013 ....................................................2

## I. JURISDICTIONAL STATEMENT

The United States District Court for the District of Rhode Island ("District Court") has appellate jurisdiction to hear the appeal of the Appellant, Bank Rhode Island ("Bank"), from the Order granting the Appellee's, Pawtuxet Valley Prescription & Surgical Center, Inc. ("Debtor"), Motion to Obtain Postpetition Credit on a Secured Basis which was entered by the United States Bankruptcy Court for the District of Rhode Island ("Bankruptcy Court") on November 29, 2007, pursuant to 28 U.S.C. §158(a)(1) and Federal Rule of Bankruptcy Procedure 8001(a).

## II. ISSUES PRESENTED FOR REVIEW

Whether the Bankruptcy Court erred in granting the Debtor's Motion to Obtain Postpetition Credit on a Secured Basis and by entering the Order under 11 U.S.C. §364(d) on November 29, 2007 (the "DIP Financing Order")? More specifically, did the Bankruptcy Court err in determining that the Bank was adequately protected and, as a result, err in authorizing the Debtor to purchase and obtain an inventory of the drug Synagis on an open line of credit basis from a particular supplier, and to secure that line of credit by providing the supplier with a first position, super-priority lien on the inventory and accounts receivable, thereby allowing the extraordinary relief of obtaining postpetition debtor-in-possession secured financing under 11 U.S.C. §364(d) by priming the Bank's first position lien on the cash collateral?

## III. STANDARD OF REVIEW

In reviewing an appeal from a bankruptcy court, the district court must apply the same familiar standards of review applicable to direct appeals of civil cases to courts of appeal in general. *In re Singleton*, 284 B.R. 322, 323 (D.R.I. 2002) (*citing In re LaRoche*, 969 F.2d 1299, 1301 (1st Cir. 1992)). Thus, a district court must review a bankruptcy court's factual findings under the clearly erroneous standard, and conclusions of law must be considered *de novo*.

Therefore, this District Court may set aside errors of law and clearly erroneous factual findings made by the Bankruptcy Court. *Id. See also* Fed.R.Bank.P. 8013. A factual finding is clearly erroneous when, based upon all of the oral or documentary evidence, the reviewing court is left with the "definite and firm conviction that a mistake has been committed." *In re Slater Health Center, Inc.*, 306 B.R. 20, 23 (D.R.I. 2004) (citations omitted).

## IV. STATEMENT OF THE CASE[1]

A. PERTINENT BACKGROUND & TRAVEL OF THE CASE

On October 8, 2007, the Debtor filed a Motion to Obtain Postpetition Credit on a Secured Basis under 11 U.S.C. §364(d), together with Memorandum of Law in Support ("DIP Financing Motion"). The Debtor asserted that the lifeline of its business operations would be the sale of the drug Synagis[2] during the flu season (late October-April), and that a successful Chapter 11 reorganization hinges on the Debtor obtaining this critical drug from one of its suppliers. In support of its DIP Financing Motion, the Debtor filed an Exhibit A October 9, 2007, which purported to contain the actual sales figures for the 2006-2007 Synagis season and the Debtor's

---

[1] For the sake of brevity, the Bank incorporates herein by reference in its entirety the "STATEMENT OF THE CASE" set forth in its initial opening "BREIF OF APPELLANT-CREDITOR" filed with this District Court on December 14, 2007 in the Bank's related appeal **C.A. No. 07-390S** ("Bank's Cash Collateral Brief"), a copy of which is attached hereto as Addendum A. (All capitalized terms used herein shall have the same meaning as previously defined in the Bank's Cash Collateral Brief.) Thus, in this opening Brief, the Bank will only supplement the evidence presented to the Bankruptcy Court from and after the Bankruptcy Court entered the Cash Collateral Order on October 5, 2007.

The Bank's appeal from the Cash Collateral Order and the within appeal from the DIP Financing Order both involve the ongoing postpetition use of the Bank's cash collateral by the Debtor and concern the critical issue of whether or not the Bank is adequately protected during the Debtor's use of the cash collateral. More importantly, updated financial information concerning the status of the Debtor's ongoing business operations had been continuously provided to the Bankruptcy Court since the Debtor's Petition Date. Consequently, in connection with determining the Debtor's DIP Financing Motion, the Bankruptcy Court had within its knowledge the ongoing detrimental changes to the Debtor's financial situation which occurred over time, which is very significant in the within appeal from the DIP Financing Order. This District Court should have the benefit of all of the same information that was present before the Bankruptcy Court when it made its ruling granting the Debtor's DIP Financing Motion.

[2] According to the Debtor, the drug Synagis is used to treat RSV (rhino syncytial virus) in the lungs of babies born prematurely.

projections for the upcoming 2007-2008 Synagis season. The Debtor sought authorization to purchase and obtain an inventory of the drug Synagis on an open line of credit basis from a supplier, H.D. Smith. To secure the line of credit, the Debtor sought permission to provide H.D. Smith with a first position, super-priority lien on the Synagis inventory and the accounts receivable eventually generated by the Debtor from the sale of Synagis. However, the Debtor admitted that until those Synagis receivables are collected, the Debtor did not have any unencumbered cash in hand to service the new postpetition debt that will be incurred. The only cash it had was the Bank's cash collateral. Consequently, the Debtor would have no choice but to use the Bank's cash collateral to initially pay for and service the indebtedness to H.D. Smith. In short, the Debtor sought the extraordinary relief of obtaining debtor-in-possession postpetition financing under 11 U.S.C. §364(d) by priming: (i) the Bank's first position lien on the prepetition cash collateral; and (ii) the Bank's first position replacement lien on the inventory, accounts receivable, and cash collateral generated postpetition. Thus, the Bank objected to the Debtor's DIP Financing Motion. The Bank argued that the Debtor could not satisfy its burden to demonstrate that the Bank's secured interest in the cash collateral will be adequately protected under the proposed postpetition line of credit financing plan. An evidentiary hearing was held over the course of several days, *i.e.* on October 18, 2007 and November 7 & 8, 2007.[3]

During the evidentiary hearing, the Debtor relied upon the Bankruptcy Court's findings set forth in the Cash Collateral Order and made the same argument pertaining to adequate protection, *i.e.* that there was a sufficient "equity cushion" because the Debtor's assets (consisting of the Sandy Bottom real Property, the inventory, and the equipment/machinery)

---

[3] An Interim Consent Order Regarding Postpetition Credit was entered by the Bankruptcy Court on October 29, 2007, and another Interim Order, extending the postpetition credit authorization of October 29, 2007 until further order, was entered by the Bankruptcy Court on November 7, 2007.

were worth more than the $2,500,000 Indebtedness owed to the Bank. Therefore, the Bank was adequately protected and the Debtor should be allowed to obtain the proposed postpetition secured financing described above. The Debtor argued that the accounts receivable in this case are simply "the gravy," and that it didn't matter that there was actually erosion in the total amount of accounts receivable since the Petition Date, *i.e.* "less gravy in the boat." 11/7/07 Transcript at pp. 3-4. The Debtor believes it can use up as much cash "soft" collateral as it wants to because of the Bankruptcy Court's prior finding of adequate protection in the other "hard" assets. The Debtor's position was that the Bankruptcy Court already decided the adequate protection issue via the Cash Collateral Order, and that previous ruling was still binding in connection with the DIP Financing Motion.

On the other hand, the Bank argued that because of the new extraordinary relief being sought by the Debtor under §364(d) (*i.e.*, priming the Bank's first position prepetition lien and postpetition replacement lien on the inventory, accounts receivable, and cash collateral), the Bankruptcy Court was required to take another look at the adequate protection issue under this new context, <u>specifically</u> the correct valuation standard to apply to the Property and whether the additional risk to be undertaken by the Bank was justified under the circumstances. The Bank asserted that its cash collateral was <u>not adequately protected from further future deterioration</u> because the Debtor acknowledged that the current cash collateral would have to be used by the Debtor: (a) to initially pay for or service the new Synagis secured debt; and (b) to pay for the ongoing general operating expenses of the Debtor's business during the so-called Synagis season. Under the Debtor's proposed financing plan, the postpetition secured creditor, H.D. Smith, would ultimately be paid in full from the Synagis proceeds collected without having to incur any liability whatsoever for the Debtor's general operating expenses. 10/18/07 Transcript

at p. 39-41. Furthermore, the Bank asserted that: (i) the total value of the Debtor's assets was actually less than the Indebtedness owed to the Bank (because the *liquidation value* of the Property should be used in the adequate protection analysis under §364(d), and the financial reports generated by the Debtor pertaining to the value of its accounts receivable and inventory continued to be flawed and unreliable); and (ii) the prospect of a successful Chapter 11 reorganization of the Debtor was less likely than during the cash collateral hearing (when it was slim at best). Thus, the additional risk to be undertaken by the Bank was NOT justified.

B. EVIDENCE IN THE RECORD RELATING TO THE VALUE OF THE DEBTOR'S ASSETS (the Collateral Securing the Indebtedness to the Bank)

As set forth in the prior Cash Collateral Order, the Bankruptcy Court determined that the total value of the collateral assets securing the Indebtedness to the Bank was $2,578,700, based upon the following:

1. Pursuant to a prior appraisal performed by Fred C. Eichmann, SRA, of Peter M. Scotti & Associates, Inc., effective as of May 16, 2007 (the "Scotti Appraisal"), the stipulated *fair market value* of the Property is $2,200,000;

2. The value of the Debtor's accounts receivable was treated as zero;

3. The *liquidation value* of the particular machines & equipment appraised by Mr. Shapiro is $253,700 (Debtor's Cash Collateral Exhibit 5); and

4. The *liquidation value* of the Debtor's vehicles ($75,000) and inventory ($50,000) appraised by Mr. Ponte is $125,000 (9/19/07 Transcript at pp.94-96; 9/21/07 Transcript at pp.12, 14, 16-19, 26; Debtor's Cash Collateral Exhibit 2).

*See* Cash Collateral Order at p. 4. Thus, the existence of a slim equity cushion was found to be sufficient adequate protection by the Bankruptcy Court. As fully explained in the Bank's Cash Collateral Brief and the Bank's "REPLY BREIF OF APPELLANT-CREDITOR" filed with this Court on January 22, 2008 in the Bank's related appeal **C.A. No. 07-390S** ("Bank's Cash Collateral Reply Brief"), a copy of which is attached hereto and incorporated herein by reference

as Addendum B, the Bankruptcy Court made clearly erroneous findings of fact and wrong conclusions of law in the Cash Collateral Order based upon the totality of the evidence in the record. Most importantly, the Bankruptcy Court rejected and continued to reject in connection with the Debtor's DIP Financing Motion, the Bank's argument that under the circumstances of this case, the *liquidation value* (amount that would likely be obtained in a foreclosure sale by the Bank) of the Property must be used in the adequate protection analysis.

The Bank sought to provide evidence, through the testimony of Thomas O. Sweeney, SIOR, that, based upon the appraised fair market value and all of the standards, conditions and assumptions set forth in the Scotti Appraisal, the *liquidation value* of the Property is approximately seventy-five (75%) percent of the appraised fair market value, or $1,650,000. The Bankruptcy Court erroneously refused to consider this evidence or reexamine the adequate protection issue. Thus, the Bank made an offer of proof on the record. 11/8/07 Transcript at pp. 3-6.

C. EVIDENCE IN THE RECORD RELATING TO THE DEBTOR'S BUSINESS OPERATIONS

1. Debtor's Financial Reports

As set forth in Bank's Cash Collateral Brief, the Debtor reported an actual loss as of August 31, 2007 in the amount of $260,369. Furthermore, the total outstanding accounts receivable as of August 31, 2007 had dropped markedly from the amount previously reported to the Bank as of July 31st. Debtor's Cash Collateral Exhibit 1; Bank's Cash Collateral Exhibit 23. In addition, by August 31, 2007, there was a substantial increase in the percentage of receivables over 90 days. *Id.* Also, commencing on the Petition Date of September 4th, the Bank tracked the daily activity of the Debtor's operating and payroll accounts, and the combined cash balance at the end of each day. The post-petition combined cash balance fell from $115,656 on the Petition

Date to $65,121 by September 21, 2007, a total loss of $50,535 in a little over two (2) weeks. Thus, the Debtor was on a downward slide. The Debtor projected that it would continue to operate at a loss during the months of September and October of 2007, allegedly until the Synagis season really began in November of 2007. 9/19/07 Transcript at pp. 33-36; Bank's Cash Collateral Exhibit 13.

As predicted, on October 30, 2007, the Debtor reported an actual loss for the month of September 2007 in the amount of $294,258. Bank's DIP Financing Exhibit 2. A mere two days later, on November 1, 2007, the Debtor provided to the Bank revised financial information for the month of September. The Debtor made so-called year end adjustments to the September 2007 numbers that were previously provided on October 30th. The Debtor increased the amount of its total net sales by approximately $56,000 and decreased the total cost of goods sold (an alleged inventory adjustment) by approximately $180,000. As a result of those changes, the Debtor was now reporting a September loss of $60,953 as opposed to $294,258.[4] 11/8/07 Transcript at pp. 11-12; Bank's DIP Financing Exhibit 3.

The Debtor also provided the required Monthly Operating Report to the United States Trustee's Office for the month of September 2007. Bank's DIP Financing Exhibit 4. There, on the page entitled "Statement of Operations," the Debtor is reporting the same total net sales ($335,461) and cost of goods sold ($337,807) as was reported in the financial statement provided to the Bank on October 30th. Thus, the Debtor's Monthly Operating Report also shows an actual loss for the month of September 2007 in the amount of approximately $294,000. However, on

[4] The Debtor does not maintain a perpetual inventory count. A third party comes into the Debtor's place of business and performs an actual inventory audit once every quarter. During the interim months, the Debtor relies on inventory projections. An actual inventory count was performed on September 30, 2007, at fiscal year end. The audit uncovered that the Debtor's inventory projections for that last fiscal quarter were largely overestimated. For the Debtor's benefit, the Debtor reflected the entire adjustment in the revised report for the month of September 2007, which conveniently was the first month of business operations postpetition.

the page entitled "Accounts Receivable Reconciliation and Aging," the Debtor reports that the "amounts billed" equaled $392,151, which is the total net sales figure contained in the revised financial statement provided to the Bank on November 1st. Therefore, the Debtor used figures from both the October 30th and November 1st financial reports. 11/8/07 Transcript at pp. 13-15; Bank's DIP Financing Exhibit 4. In addition, the Debtor failed to include in its October 30th and November 1st financial reports certain expenses accrued during the month of September 2007. For example, the Debtor failed to include in its profit and loss calculations the rent payment accrued under the lease with Sandy Bottom for the Property, the loan interest expense being accrued to the Bank, and any bad debt expenses. 11/8/07 Transcript at pp. 27-28.

In summary, all of the above reports are further examples of how the Debtor's financial information continues to be as blatantly inconsistent and unreliable postpetition as it was prepetition.

Furthermore, the total outstanding accounts receivable (excluding the Synagis receivables), as reported by the Debtor to the Bank from July 31, 2007 through October 31, 2007, had decreased by approximately $540,000. **Thus, the Debtor had collected and spent $540,000 of the Bank's cash collateral in just four months!** More importantly, the percentage of total receivables over 90 days had significantly increased from 46% as of the end of July to **almost 70%** as of the end of October, making those receivables more unlikely to ever be collected by the Debtor. 11/8/07 Transcript at pp. 16-18; Bank's DIP Financing Exhibit 5. Even if only the postpetition September and October 2007 numbers are examined, the Debtor's total outstanding accounts receivable shrank during those two months by more than $200,000, with the percentage of receivables being over 90 days increasing by 12%. Consequently, the evidence showed that the Bank's cash collateral was eroding at an alarming rate, while at the same time,

the probability of collecting the remaining receivables was becoming lower and lower. *Id. See also* 11/8/07 Transcript at pp. 18-22; Bank's DIP Financing Exhibit 6 & Exhibit 7.

2. Evidence Pertaining to Synagis

Attached as Exhibit A to the Debtor's DIP Financing Motion (but referred to as Debtor's Exhibit 1 at the hearing) were "Synagis Income Statements" which purported to reflect actual sales information from the 2006-07 Synagis season and the Debtor's projections for the 2007-08 Synagis season ("Synagis Statements"). Additional administrative costs and operating expenses incurred by the Debtor in connection with the sale of Synagis, such as additional nurses to administer the drug and mileage reimbursements to those nurses, are included in the Synagis Statements. However, in preparing the Synagis Statements, the Debtor separated the Synagis business from the rest of the business engaged in by the Debtor. In fact, the Debtor admitted that the monthly overhead expenses with respect to the rest of the Debtor's business operations were not considered and not included in the calculation of net profit of $1,084,997 set forth on the Synagis Statements. 10/18/07 Transcript at p. 31-32. Thus, the operating profit only pertains to one isolated aspect of the Debtor's business, Synagis, and is certainly misleading as to the Debtor's overall business operations.

The Bank showed the Bankruptcy Court how misleading the Debtor's Synagis projections really were when combined with the Debtor's other business operations. By this time, the Bank had received from the Debtor actual performance figures for the months of August, September and October 2007. The Bank compared the actual sales/revenue and cost of goods sold numbers to the Debtor's August 30, 2007 projections for those same three months. Based upon that analysis, the Bank found that the Debtor's non-Synagis projections for August, September and October 2007 were off by 25% (the Debtor only achieved 75% of what it

projected). Thus, the Bank applied the 75 % accuracy rate to the Debtor's non-Synagis projections reported for the months of November 2007 through April 2008, *i.e.* the so-called Synagis season. 11/8/07 Transcript at pp. 30-34, 63-67; Bank's DIP Financing Exhibit 8.[5] Furthermore, in its combined calculations, the Bank gave the Debtor full credit for all of its projected Synagis business, *i.e.* the Bank included 100% of the Synagis sales projected on the Debtor's Synagis Statements. *Id.* In conclusion, the Bank's analysis shows that if the Debtor continues to achieve 75% of what it projects in its non-Synagis business <u>and</u> if the Debtor is given the benefit of the doubt that it will achieve 100% of what it projects in Synagis business, the Debtor will realize an overall operating profit of only $61,000, as opposed to the Debtor's projected overall profit of $524,000. *Id.* Furthermore, that figure does <u>not</u> include monthly rent expenses, loan interest expenses, or bad debt expenses. Therefore, the Bank demonstrated that the Synagis season will not be the savior the Debtor portrayed it to be.

D. <u>THE BANKRUPTCY COURT'S DECISION</u>

Despite all of the disparaging evidence before the Bankruptcy Court, on November 29, 2007, it entered the DIP Financing Order. Consequently, the Bank timely filed a Notice of Appeal to this District Court on December 6, 2007.

## V. <u>ARGUMENT</u>

A. <u>APPLICABLE LAW</u>

11 U.S.C. §364(d) allows postpetition financing by a debtor-in-possession only when certain prerequisites are met. Section 364(d) provides as follows:

---

[5] A true and correct copy of the Bank's DIP Financing Exhibit 8 is attached hereto as <u>Addendum C</u>. In connection with its designation of the record on appeal, the Bank mistakenly submitted the wrong exhibit to the Bankruptcy Court for transfer to this Court.

> (1) The court, after notice and hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if–
>
> (A) the trustee [or debtor-in-possession] is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee [or debtor-in-possession] has the burden of proof on the issue of adequate protection.

11 U.S.C. §364(d).

Regarding adequate protection under §364(d), the statute evidences the general policy of the Bankruptcy Code to recognize the primacy of prepetition contractual liens and to preserve the financial interests created thereby. *In re Stony Creek Technologies, LLC*, 364 B.R. 882 (Bankr.E.D.Pa. 2007) (citing *In re Mosello*, 195 B.R. 277, 287 (Bankr.S.D.N.Y. 1996)). Thus, §364(d) permits the priming of an existing lien only as a **"last resort,"** and **because priming is extraordinary**, a court must be **"particularly cautious"** in determining whether a subordinated prepetition secured creditor is adequately protected. *Id.* (Emphasis added). *See also In re First South Savings Association,* 820 F.2d 700, 710 (5th Cir. 1987) ("Given the fact that super priority financing displaces liens on which creditors have relied in extending credit, a court that is asked to authorize such financing must be particularly cautious when assessing whether the creditors so displaced are adequately protected.").

When engaging in the adequate protection analysis under §364(d)(1)(B), the Court must be cognizant that the value of the Bank's collateral must be determined in light of the purpose of the valuation.

> The purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy. (citations omitted; quotation marks omitted.) The goal of adequate protection is to safeguard the secured creditor from diminution in value of its interest during the Chapter 11 reorganization. (citations omitted;

> quotation marks omitted.) "In other words, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." *In re Swedeland Development Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).
>
> ***
>
> [T]he "important question" in determining the adequacy of protection under section 364(d)(1)(B) is whether the interest of the secured creditor whose lien is to be primed "is being unjustifiably jeopardized." (citations omitted.)

*In re Mosello*, 195 B.R. at 288-289. Furthermore, "Congress did not contemplate that a secured creditor could find its [priority] position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects." *In re Windsor Hotel, L.L.C.*, 295 B.R. 307, 314 (Bankr.C.D.Ill. 2003) (citing *Swedeland Development*, 16 F.3d at 567). *See also Stony Creek, supra.* Therefore, a finding of adequate protection should be based upon facts, or on projections grounded on a firm evidentiary basis. *In re Windsor Hotel, supra.* (citing *Mosello*, 195 B.R. at 292).

Finally, courts have held that the existence of an "equity cushion" alone should **not** be determinative in a §364(d)(1)(B) adequate protection analysis. An equity cushion is only one factor. *See, e.g., In re Stony Creek, supra.* at note 26 (The mathematical calculation of the equity cushion and various benchmarks used in determining whether there is adequate protection for other purposes are "inappropriate in this context. **An equity cushion that will protect a prepetition secured creditor while its collateral is used in a reorganization does not necessarily protect a creditor whose liens have been subordinated.**" (emphasis added)) (citing *In re Timber Products, Inc.*, 125 B.R. 433, 433-434 (Bankr.W.D.Pa. 1991), which discusses other relevant factors to be considered, such as whether the accrual of interest on the prepetition debt will erode the equity cushion and whether the debtor's prospects for a successful reorganization are realistic). *See also In re First South Savings Association, supra.* (court found

that increase in value of collateral due to §364(d) financing could constitute adequate protection, but concluded that the Debtor's projections did not support a finding of such an increase in value).

Here, the Bankruptcy Court erred in refusing to reevaluate/reexamine the adequate protection issue in the context of §364(d)(1)(B) analysis. Thus, the Bankruptcy Court's entry of the DIP Financing Order was erroneous.

B. THE BANKRUPTCY COURT ERRED IN ALLOWING THE DEBTOR TO OBTAIN DEBTOR-IN-POSSESSION SECURED FINANCING UNDER §364(d) AS A RESULT OF ITS FINDING THAT NO ADEQUATE PROTECTION TO THE BANK WAS NECESSARY BECAUSE THE BANK HAD A SUFFICIENT "EQUITY CUSHION" IN THE COLLATERAL ASSETS OF THE DEBTOR.

1. A Liquidation Value Should Have Been Applied to All of the Debtor's Assets Securing the Indebtedness, and When the Proper Standard of Valuation (Liquidation Value) is Utilized in the §364(d) Adequate Protection Analysis, There is No Equity Cushion.

As thoroughly explained in the Bank's Cash Collateral Brief and Cash Collateral Reply Brief, the Bankruptcy Court improperly valued the collateral assets securing the Indebtedness due to the Bank from the Debtor. Most significant is the Bankruptcy Court's erroneous refusal to utilize the ***liquidation value*** of the Sandy Bottom Property in its adequate protection analysis.[6]

Had the Bank's evidence of the liquidation value of the Property been properly accepted by the Bankruptcy Court and applied to the calculation of the amount of collateral assets, there is **no equity cushion**. The Bankruptcy Court found that the liquidation value of the Debtor's machines & equipment ($253,700) and inventory ($50,000) totaled approximately $303,700. The Bankruptcy Court correctly treated the value of the Debtor's accounts receivable as zero. The Bank attempted to offer evidence to show that the liquidation value of the Property is

[6] The Bank incorporates herein by reference in their entirety the arguments supporting the application of ***liquidation value*** to the Property, which are set forth in detail in the Bank's Cash Collateral Brief and Cash Collateral Reply Brief.

approximately $1,650,000. If that liquidation value were allowed by the Bankruptcy Court and included in the §364(d) adequate protection calculation, the total collateral value would equal $1,953,700 ($303,700 + $1,650,000), far short of the Debtor's $2.5 Million Indebtedness to the Bank, and would have resulted in no equity cushion.

2. <u>The Overwhelming Evidence Established That the Debtor Cannot Maintain Stability During its Attempt to Reorganize</u>.

As explained above, courts have held that the existence of an equity cushion alone should not be determinative in a §364(d)(1)(B) adequate protection analysis. An equity cushion is only one factor for the court's consideration. *See, e.g., In re Stony Creek, supra.*; *In re Timber Products, Inc., supra.* In this case, the Debtor's prospects for a successful reorganization are unrealistic.

As demonstrated by the evidence detailed above, the Bank's cash collateral had deteriorated by approximately $540,000 in just four months, while during that same time period, the percentage of total receivables over 90 days had significantly increased to almost 70% by the end of October. Furthermore, even if only the postpetition September and October 2007 numbers are examined, the Debtor's total outstanding accounts receivable shrank during those two months by more than $200,000, with the percentage of receivables being over 90 days increasing by 12%. Clearly, the Debtor could not maintain a stable level of receivables prepetition or postpetition. The Bank's cash collateral was quickly diminishing in value, and the odds of the Debtor actually collecting the remaining outstanding receivables were getting worse as time went on. In conclusion, the Debtor could not demonstrate that it had the ability to sustain itself and make a profit in its non-Synagis business in order to be capable of surviving in the long run without exhausting the Bank's cash collateral.

3. The Debtor's Proposed Financing Analysis Was Misleading and the Inherent Additional Risk to the Bank Was Unjustified.

The Debtor consistently argued that losses in September and October 2007 were warranted because said losses were necessary to get Debtor to the profitable Synagis season. Debtor argued that even though the Bank's collateral base (*i.e.*, accounts receivable) diminished during September and October, the Bank's position and its collateral would actually improve if the Debtor could make it through the Synagis season. However, the Bank provided evidence to show that the Debtor cannot fulfill its promise.

Under the current financing arrangement authorized by the DIP Financing Order, the Bankruptcy Court increased the financial risks to the Bank of Debtor's continued operations because the Bank's first priority prepetition and postpetition replacement liens on the inventory, accounts receivable, and cash collateral are now primed as a result of the Debtor having to use non-Synagis receivables to initially pay for and to continue to service the new Synagis secured debt.

Furthermore, as detailed above, the Bank demonstrated that the Synagis season will not be the life-saving event that the Debtor portrayed it to be when the Debtor's Synagis projections are combined with the Debtor's other business operations. *See* Bank's DIP Financing Exhibit 8. Using only the Debtor's reported figures, the Bank's analysis shows that if the Debtor continues to achieve only 75% of what it projects in its non-Synagis business through and including April 2008, and if the Debtor actually achieves 100% of what it projects in Synagis business, the Debtor will realize an overall operating profit of only $61,000, as opposed to the Debtor's projected overall profit of $524,000. *Id.* That figure does not include the Debtor's monthly rent expense to Sandy Bottom for the Property, loan interest expense accrued to the Bank, or a bad debt expense, and thus, will most likely be even less than $61,000.

Consequently, under all of the circumstances, the additional risk imposed upon the Bank by the Bankruptcy Court was clearly unjustified.

## VI. CONCLUSION

Based upon all of the reasons set forth above, the Bank respectfully requests that this Court reverse and vacate the DIP Financing Order entered by the Bankruptcy Court.

Respectfully submitted,

BANK RHODE ISLAND
By its Attorneys,

/s/ Denean M. Russo
Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams Wieck DeLuca & Gemma Inc.
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700
(401) 454-8755 (facsimile)
Dated: February 12, 2008

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the within Appellant's Brief was served by electronic mail through the Federal District Court's Electronic Case Filing system on the 12th day of February, 2008, to the following counsel:

Andrew S. Richardson, Esq.
Steven J. Boyajian, Esq.
Boyajian Harrington & Richardson
andy@bhrlaw.com
steve@bhrlaw.com

Leonard J. DePasquale, Esq.
Assistant United States Trustee
ustpregion01.pr.ecf@usdoj.gov

I hereby certify that on this 12th day of February, 2008, a true copy of the within Appellant's Brief was forwarded via first class mail, postage prepaid, to the following:

Attorney Carol Ann Slocum
Klehr Harrison Harvey Branzburg & Ellers
457 Haddonfield Road, Suite 510
Cherry Hill, NJ 08002-2220

/s/ Denean M. Russo

G:\Bank Rhode Island\Pawtuxet Valley Prescription & Surgical Center, Inc\Bankruptcy Pleadings\Appellants' Brief -DIP Financing 0208.doc