**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| BANK RHODE ISLAND,<br>Appellant-Creditor,<br><br>vs.<br><br>PAWTUXET VALLEY PRESCRIPTION & SURGICAL CENTER, INC.,<br>Appellee-Debtor. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | **C.A. No. 07-390S** |

ON APPEAL FROM AN ORDER OF THE
UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND
(BK. No. 07-1767; Chapter 11)

---

BRIEF OF APPELLANT-CREDITOR
BANK RHODE ISLAND

---

Robert D. Wieck, Esq. (#1739)
Attorney Denean M. Russo (#5043)
Counsel for Plaintiff-Appellant
MacADAMS WIECK DeLUCA & GEMMA, INC.
101 Dyer Street, Suite 400
Providence, RI 02903
Telephone (401) 454-8700
Fax (401) 454-8755

Date: December 14, 2007

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ........................................................iv

I. JURISDICTIONAL STATEMENT..........................................1

II. ISSUES PRESENTED FOR REVIEW ......................................1

III. STANDARD OF REVIEW ...................................................1

IV. STATEMENT OF THE CASE ................................................2

A. PERTINENT BACKGROUND & TRAVEL OF THE CASE ........................2

B. EVIDENCE IN THE RECORD RELATING TO THE VALUE OF THE DEBTOR'S ASSETS (the Collateral Securing the Indebtedness to the Bank) ........................................5

C. EVIDENCE IN THE RECORD RELATING TO THE DEBTOR'S BUSINESS OPERATIONS ........................................6

1. Accounts Receivable System ........................................6

2. Debtor's Financial Reports for Fiscal Year 2006 ........................7

3. The Bank's Justified Concerns Regarding the Debtor's Financial Accounting Systems and the Unreliability of the Information From the Debtor ........................................8

4. Debtor's Financial Reports (Projections and Actual Results) for Fiscal Year 2007 ........................................9

D. THE BANKRUPTCY COURT'S DECISION ........................................12

V. ARGUMENT ........................................................13

A. APPLICABLE LAW ........................................................13

B. THE BANKRUPTCY COURT ERRED IN ALLOWING THE DEBTOR TO USE THE BANK'S CASH COLLATERAL AS A RESULT OF ITS FINDING THAT NO ADEQUATE PROTECTION TO THE BANK WAS NECESSARY BECAUSE THE BANK HAD A SUFFICIENT "EQUITY CUSHION" IN THE COLLATERAL ASSETS OF THE DEBTOR ........................................15

PAGE

1. A Liquidation Value Should Have Been Applied to All of the Debtor's Assets Securing the Indebtedness ....................................15

2. When the Proper Standard of Valuation (Liquidation Value) is Utilized in the §363 Adequate Protection Analysis, There is No Equity Cushion ..........................................................18

3. The Overwhelming Evidence Established That the Debtor Cannot Maintain Stability During its Attempt to Reorganize ..........................19

VI. CONCLUSION ...............................................................20

# TABLE OF AUTHORITIES

CASES PAGE

*In re Demakes Enterprises, Inc.*, 145 B.R. 362 (Bankr.D.Mass. 1992) ..........................15,16

*In re Dynaco Corporation*, 162 B.R. 389 (Bankr.D.N.H. 1993) ....................................14

*In re Gould*, 348 B.R. 78 (Bankr.D.Mass. 2006) ......................................................17

*In re LaRoche*, 969 F.2d 1299 (1st Cir. 1992) ........................................................1

*In re Ledgemere Land Corporation*, 125 B.R. 58 (Bankr.D.Mass. 1991) ....................5,15,16

*In re Megan-Racine Associates, Inc.*, 202 B.R. 660 (Bankr.N.D.N.Y. 1996) .................14,19

*In re Mullen*, 172 B.R. 473 (Bankr.D.Mass. 1994) ....................................................19

*In re Robbins*, 119 B.R. 1, (Bankr.D.Mass. 1990) ....................................................15

*In re Singleton*, 284 B.R. 322 (D.R.I. 2002) ...........................................................1

*In re Smithfield Estates*, 48 B.R. 910 (Bankr.D.R.I. 1985) ..........................................14

*In re Stony Creek Technologies, LLC*, 364 B.R. 882 (Bankr.E.D.Pa. 2007) ......................16

*In re T.H.B. Corporation*, 85 B.R. 192 (Bankr.D.Mass 1988)............................5,15,16,17

*In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72 (1st Cir. 1995) ..........................16-17

*Internal Revenue Service v. Patriot Contracting Corporation*,
2007 WL 433392 (D.N.J. Feb. 7, 2007) ..........................................................2

STATUTES AND RULES

11 U.S.C. §361 ..............................................................................1,5,14

11 U.S.C. §363 ........................................................................13,14,15,17,18

11 U.S.C. §363(c)(2) ....................................................................,4,13,14

11 U.S.C. §363(c)(2)(B) ...........................................................................1

11 U.S.C. §363(e) ...............................................................................1,5,14

11 U.S.C. §363(p) ..............................................................................14,18

STATUTES AND RULES CONT'D. PAGE

11 U.S.C. §364 ....................17

11 U.S.C. §364(d) ....................16,18

11 U.S.C. §506(b) ....................16-17

11 U.S.C. §1107 ....................2,14

11 U.S.C. §1108 ....................2,14

28 U.S.C. §158(a)(1) ....................1

Federal Rule of Bankruptcy Procedure 8001(a) ....................1

Federal Rule of Bankruptcy Procedure 8013 ....................2

Federal Rule of Bankruptcy Procedure 9017 ....................17

Federal Rule of Evidence 1101(b) ....................17

## I. JURISDICTIONAL STATEMENT

The United States District Court for the District of Rhode Island ("District Court") has appellate jurisdiction to hear the appeal of the Appellant, Bank Rhode Island ("Bank"), from the final Order Allowing Use of Cash Collateral entered by the United States Bankruptcy Court for the District of Rhode Island ("Bankruptcy Court") on October 5, 2007, pursuant to 28 U.S.C. §158(a)(1) and Federal Rule of Bankruptcy Procedure 8001(a).

## II. ISSUES PRESENTED FOR REVIEW

1. Did the Bankruptcy Court err in granting the Motion for Final Orders Authorizing Use of Cash Collateral filed by the Debtor, Pawtuxet Valley Prescription & Surgical Center, Inc. ("Debtor"), and by entering the Order Allowing Use of Cash Collateral under 11 U.S.C. §363(c)(2)(B) on October 5, 2007 (the "Cash Collateral Order"), which authorized the Debtor, as the Chapter 11 debtor-in-possession, to use its pre-petition and post-petition cash receipts (*i.e.*, the Bank's cash collateral) to finance the Debtor's post-petition business operations?

2. Did the Bankruptcy Court err in determining that the Bank's security interest in the Debtor's pre-petition and post-petition accounts receivable assets (*i.e.*, the Bank's cash collateral) were adequately protected for purposes of 11 U.S.C. §363(e) and §361 during the Debtor's post-petition use thereof?

## III. STANDARD OF REVIEW

In reviewing an appeal from a bankruptcy court, the district court must apply the same familiar standards of review applicable to direct appeals of civil cases to courts of appeal in general. *In re Singleton,* 284 B.R. 322, 323 (D.R.I. 2002) (*citing In re LaRoche*, 969 F.2d 1299, 1301 (1st Cir. 1992)). Thus, a district court must review a bankruptcy court's factual findings under the clearly erroneous standard, and conclusions of law must be considered *de novo*.

Therefore, this District Court may set aside errors of law and clearly erroneous factual findings made by the Bankruptcy Court. *Id.* *See also* Fed.R.Bank.P. 8013. A factual finding is clearly erroneous when, based upon all of the oral or documentary evidence, the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *Internal Revenue Service v. Patriot Contracting Corporation*, 2007 WL 433392, *5 (D.N.J. Feb. 7, 2007) (citations omitted).

## IV. STATEMENT OF THE CASE

### A. PERTINENT BACKGROUND & TRAVEL OF THE CASE

The Debtor is a Rhode Island corporation, having a place of business located at 85 Sandy Bottom Road, Coventry, Rhode Island. The Debtor operates a retail pharmacy, a pharmaceutical compounding business, and also provides home infusion therapy services throughout Rhode Island. JPO at §I., ¶1.[1] A related entity, Sandy Bottom Properties, LLC ("Sandy Bottom"), is the real estate holding company which owns the property located at 57-89 Sandy Bottom Road, Coventry, Rhode Island (the "Property") upon which the Debtor operates its business. JPO at §I., ¶4. Leo R. Blais ("Blais") is a principal and the President of the Debtor, and is also a Member of Sandy Bottom. JPO at §I., ¶5.

On September 4, 2007 (the "Petition Date"), the Debtor filed with the Bankruptcy Court a Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code. JPO at §I., ¶3. Since the Petition Date, the Debtor has been operating its business and managing its affairs as a debtor-in-possession pursuant to §1107 and §1108 of the Bankruptcy Code. *Id.* From and

[1] The Debtor previously provided pharmaceutical services to long term care and assisted living facilities (the "LTC Division") in addition to its current business operations. The Debtor's LTC Division operated at a loss and, consequently, the LTC Division was wound down and ceased operations in July 2007. JPO at §I., ¶¶15, 16. [On September 14, 2007, the parties filed a Joint Pretrial Order (the "JPO") with the Bankruptcy Court, which included, *inter alia*, a list of stipulated, undisputed facts. All references thereto shall be made herein in the following form: "JPO at §I., ¶__."]

after the Petition Date, the Debtor has had a payroll of 49 employees, which includes its principal Mr. Blais. JPO at §I., ¶17.

During the time period of December 2001 through and including October 2006, the Debtor entered into several financing transactions with the Bank, whereby the Bank became the holder of a first priority security interest in all of the assets (except vehicles) of the Debtor, including without limitation its "Cash Collateral" as that term is defined by §363(c)(2) of the Bankruptcy Code. JPO at §I., ¶7. As of the Bankruptcy Petition Date, the Debtor was obligated to the Bank under the loan documents in the total amount of approximately $2,500,000 ("Indebtedness").[2] JPO at §I., ¶6. The Indebtedness due to the Bank from the Debtor is further secured by, *inter alia*, various mortgages covering the Property that were executed and delivered to the Bank by Sandy Bottom including, but not limited to, an Open-End Mortgage, Security Agreement and Assignment of Leases and Rents dated March 10, 2003, and recorded with the Records of Land Evidence of the Town of Coventry, Rhode Island on March 11, 2003, in Book 1321 at page 123, as amended thereafter from time to time. JPO at §I., ¶8. The Debtor is in default on its obligations to the Bank. JPO at §I., ¶11.

Historically, the Debtor's primary supplier of pharmaceutical goods has been AmerisourceBergen Drug Corporation ("ABDC"), located in the State of New Jersey. JPO at §I., ¶18. The sales by ABDC to the Debtor were on an open, revolving account basis. In return, the Debtor granted to ABDC a security interest in all of the Debtor's assets. However, on December 14, 2001, the Bank and ABDC had entered into a subordination agreement whereby the security interest of ABDC was subordinated in all respects to the security interest of the

[2] Importantly, during the pendency of the Bankruptcy Court proceeding, interest continues to accrue on the principal balance of each of the outstanding Bank loans to Debtor in accordance with the terms of the respective loan documentation.

Bank. JPO at §I., ¶12. Thus, ABDC holds only a second priority security interest in all of the Debtor's assets, including its "Cash Collateral" as defined by §363(c)(2). JPO at §I., ¶10. As of the Petition Date, the Debtor owed ABDC approximately $2,000,000 for pharmaceutical goods sold and delivered to the Debtor.

On September 4, 2007, the Debtor filed a Motion for Interim and Final Orders Authorizing Use of Cash Collateral. On September 5, 2007, the Bankruptcy Court gave interim approval for the Debtor's use of the Bank's cash collateral, and scheduled the matter for an evidentiary hearing. JPO at §I., ¶14.[3] Thereafter, the JPO was filed by the parties on September 14, 2007, and the evidentiary hearing was held over the course of several days, *i.e.* on September 5th, 17th, 18th, 19th, 21st and October 4th, 2007.

During the evidentiary hearing, the Debtor argued that there was a sufficient "equity cushion" because the Debtor's assets (consisting of the real Property, accounts receivable, inventory, and equipment/machinery) were worth more than the $2,500,000 Indebtedness owed to the Bank, and therefore, the Debtor should be allowed to use the Bank's cash collateral and the Bank was adequately protected -- there was no need to provide any other protection to the Bank for the Debtor's use of the Bank's cash collateral during its attempt to reorganize. On the other hand, the Bank argued and presented evidence to show that: (i) the total value of the Debtor's assets as of the Petition Date was actually less than the Indebtedness owed to the Bank (because the *liquidation value* of the Property should be used in this adequate protection analysis, and the financial reports generated by the Debtor pertaining to the value of its accounts receivable and inventory are so flawed and unreliable that an accurate value cannot be ascertained); (ii) the Bank's cash collateral was not adequately protected from further future

[3] The Order authorizing the Debtor's interim use of cash collateral was eventually entered by the Bankruptcy Court on September 27, 2007.

deterioration; and (iii) the prospect of a Chapter 11 reorganization of the Debtor was slim to none -- rather the company should be liquidated under Chapter 7 of the Bankruptcy Code.

B. EVIDENCE IN THE RECORD RELATING TO THE VALUE OF THE DEBTOR'S ASSETS (the Collateral Securing the Indebtedness to the Bank)

Based upon a prior appraisal, the stipulated *fair market value* of the Property is $2,200,000.[4] JPO at §I., ¶9.

Mr. Manuel Ponte opined that the *forced liquidation value* of the Debtor's personal property [furniture & fixtures, medical & store equipment (approx. $400,000), vehicles (approx. $75,000), prescription medication and non-prescription inventory (approx. $50,000), and two (2) outside generators (approx. $40,000)] is between $500,000 and $600,000. Mr. Ponte provided an *"in-place" value* (*i.e.*, the value if someone were to purchase the Debtor's store facility as is) of those same items plus leasehold improvements and marketing equipment as being $1-1.2 Million. 9/19/07 Transcript at pp.94-96; 9/21/07 Transcript at pp.12, 14, 16-19, 26; Debtor's Exhibit 2. The overwhelming majority of the appraised value of the medical equipment is comprised of two (2) auto-med pill packaging machines. 9/19/07 Transcript at pp. 105-108. Mr. Ponte did not appraise individual items. Even though Mr. Ponte had not conducted a sale of medical related equipment/assets for at least 10 years, he decided to use the appraisal methodology of assigning a liquidation sale rate of return of 30% of the actual cost of all of the property, which cost figures were provided to him by the Debtor, to arrive at the overall forced liquidation sale value of $500,000-600,000. 9/21/07 Transcript at pp. 20-21.

---

[4] The parties do not dispute that in determining the value of the Bank's security interest for purposes of deciding whether the Bank is adequately protected under 11 U.S.C. §363(e) and §361, collateral of a significant value which secures a third party guaranty of the Debtor's Indebtedness, such as the Property, may be included in the calculation. *See In re T.H.B. Corporation*, 85 B.R. 192, 194 (Bankr.D.Mass 1988) (guaranty was secured by mortgages on two pieces of real property with substantial value); *In re Ledgemere Land Corporation*, 125 B.R. 58, 62 (Bankr.D.Mass. 1991) (guaranty was secured by collateral worth $250,000).

Thereafter, the Debtor obtained a second appraisal of only certain items/pieces of the medical equipment. Mr. Samuel Shapiro determined that the liquidation value of a dose encapsulating machine, the two (2) auto-med computerized pill packing machines, and sixty-three (63) assorted infusion pumps total $253,700. 10/04/07 Transcript at pp. 8-9, 16-18, 21-22; Debtor's Exhibit 5.

The Debtor reported that as of July 31, 2007, its total Net Accounts Receivable was allegedly $1,427,132, with the total of $529,841 (37%) being over 90 days late. Debtor's Exhibit 1. As of August 31, 2007, the Debtor's total Net Accounts Receivable dropped to allegedly $1,143,716, with the total of $561,535 (increased to 49%) being over 90 days late. Bank's Exhibit 23.

C. <u>EVIDENCE IN THE RECORD RELATING TO THE DEBTOR'S BUSINESS OPERATIONS</u>

1. <u>Accounts Receivable System</u>

According to the Debtor, approximately 70-80 percent of the Debtor's accounts receivable consists of anticipated reimbursements from insurance companies. 9/17/07 Transcript at p. 19. The various methodology used by the Debtor to arrive at the numbers reflected on the Debtor's accounts receivable aging reports is inherently flawed. In fact, the Debtor admits that its accounts receivable reporting system has not been recently tested for accuracy and/or reliability. For example, the Debtor routinely bills certain insurance companies at a higher rate and amount for contractual insurance claim reimbursements even though it knows it will actually collect less than the billed amount, thereby necessitating adjustments in the system by the Debtor in later months when it collects the actual payment. 9/17/07 Transcript at pp. 14-16, 77-81; Debtor's Exhibit 1. In addition, approximately four years ago, Blue Cross & Blue Shield of Rhode Island ("BCBSRI") had made an estimated, preliminary, advance lump-sum payment of

$400,000 - $500,000 to the Debtor for particular batches of unprocessed medical claims (accounts receivable) submitted by the Debtor, and periodically thereafter, as BCBSRI actually reviews and processes those individual claims, BCBSRI notifies the Debtor if a claim has been rejected or of the actual amount it has finally approved for the individual claim, which may have been adjusted upward or downward from the original claim submitted by the Debtor. Approximately $171,700 of the advance payment from BCBSRI still remains unallocated because certain claims have not yet been processed by BCBSRI. 9/17/07 Transcript at pp. 13-14, 71-76; Debtor's Exhibit 1. Furthermore, in calculating its net accounts receivable at the end of each month, the Debtor estimates and subtracts out an amount for bad debt, *i.e.* a designated percentage of the outstanding receivables in a given category that the Debtor believes will never be collected. 9/17/07 Transcript at pp. 17-18, 81-83; Debtor's Exhibit 1. As a result of all of the above, the Debtor's accounts receivable system permits the Debtor's personnel to go into the system at a later date and adjust the past entries made for transactions during prior months/time periods. JPO at §I., ¶19. The Debtor admitted that this ability constituted an inadequate accounting control or a deficiency in the system. 9/17/07 Transcript at pp. 46-47.

2. Debtor's Financial Reports for Fiscal Year 2006

In November of 2006, the Debtor had reported to the Bank that it suffered a loss of $383,727 for its fiscal year ending September 30, 2006. 9/17/07 Transcript at pp. 84-85; Bank's Exhibit 1. Three months later, in February 2007, the Debtor had adjusted its prior income statement calculations and reported to the Bank that it suffered a loss in its 2006 fiscal year in the amount of $974,552, more than double the amount reported to the Bank in November 2006. 9/17/07 Transcript at pp. 87-88; Bank's Exhibit 2. The adjustments were allegedly made because there were variances between the accounts receivable aging balances and the accounts

receivable general ledger balances, and the sales figures on the general ledger did not reconcile with the balance sheet. 9/18/07 Transcript at pp. 8-9, 17-19.

Again, in May 2007, the Debtor reported to the Bank another increase in its loss calculation for fiscal year ending September 30, 2006. The Debtor reported a year end loss of $1,167,726, approximately $192,000 more than reported to the Bank in February 2007. These adjustments were made because the Debtor discovered in or around March 2007 that the value of its retail and IV inventory had previously been significantly overstated. 9/18/07 Transcript at pp. 20-24, 26-28; Bank's Exhibit 3.

The Debtor acknowledged that it doesn't have a perpetual/continuous inventory tracking system to monitor its current inventory levels. Rather, a third-party company currently comes into the Debtor's place of business once every quarter and physically conducts an inventory. 9/17/07 Transcript at pp. 68-70; 9/18/07 Transcript at p. 25.

3. <u>The Bank's Justified Concerns Regarding the Debtor's Financial Accounting Systems and the Unreliability of the Information From the Debtor</u>.

The Debtor knew about the Bank's concerns regarding the Debtor's financial accounting controls and system for quite some time, at least since early March 2007 when the Bank provided the Debtor with an executive summary of the problems or deficiencies found as a result of the first field examination of the Debtor's accounting books and records conducted by the Hollis Meddings Group at the end of February 2007. 9/18/07 Transcript at pp. 42-43; 9/19/07 Transcript at pp. 40-42; 9/21/07 Transcript at pp. 50-56; Bank's Exhibit 5. In short, the field examination revealed, *inter alia*, that the Debtor's financial books and records were unsatisfactory due to the present accounting systems in place, and that the Bank could not rely on the internally prepared financial statements. 9/21/07 Transcript at pp. 57-59; Bank's Exhibit 19. By letters dated May 23, 2007 and May 24, 2007, the Debtor responded to the Bank's concerns.

In fact, in the May 23rd correspondence, the Debtor admitted that, "The ability to alter transactions is an inherent limitation of the QS1 and Ascend [accounting] systems....It would be prohibitively expensive for the Company to change the system at this time." Bank's Exhibit 10. Thus, the Debtor continues to have the ability to change prior transactions in its system. 9/18/07 Transcript at pp. 44-46; Bank's Exhibit 10.

The Hollis Meddings Group conducted a second field examination at the end of June 2007. Basically the same problems were encountered and reiterated to the Debtor as in the first examination, with some improvement in the inventory area. The Debtor's financial books and records remained unsatisfactory and were unreliable. 9/21/07 Transcript at pp. 60-62, 65-66; Bank's Exhibit 20.

4. Debtor's Financial Reports (Projections and Actual Results) for Fiscal Year 2007

a. Misleading Projections

Sometime in September or October of 2006, the Debtor provided to the Bank projections of its anticipated monthly revenue and net income for the fiscal year commencing October 1, 2006 and ending on September 30, 2007. 9/19/07 Transcript at pp. 28-31; Bank's Exhibit 15. The Debtor continually emphasized that it is a seasonal business, generating most of its income during the winter months, primarily from the sale of a pediatric vaccine called Synagis during the cold/flu season months of November through March. Thus, it projected significantly higher revenues and net incomes for those months. 9/5/07 Transcript at pp. 6-7; 9/19/07 Transcript at pp. 30, 32; Bank's Exhibit 15. However, the actual revenues and actual net sales were consistently lower than the Debtor projected for the Synagis season. Bank's Exhibit 15. In fact, rather than having a positive net income for the month of January 2007 (the middle of the Synagis season), the Debtor operated at a loss. In addition, the company suffered a sizeable loss in income during the months of April, May, June and July of 2007, contrary to prior projections

given to the Bank. As recognized by the Bankruptcy Court, "all of the projections exceeded the actual performance." 9/19/07 Transcript at pp. 32-33, 37; Bank's Exhibit 15. Furthermore, the Debtor projected that it will continue to operate at a loss during the months of August, September and October of 2007, allegedly until the next Synagis season begins in November 2007. 9/19/07 Transcript at pp. 33-36; Bank's Exhibit 13.

b. Fluid Actual Numbers

On March 27, 2007, the Debtor provided the Bank with its financial information through February 2007. At this time, the Debtor reported to the Bank a profit of $64,853 for the month of January 2007 and a profit of $57,246 for the month of February 2007. Bank's Exhibit 6. Then, on July 27, 2007, the Debtor provided the Bank with its financial information through June 2007. However, the numbers for the prior months had changed. The Debtor now reported to the Bank a loss of $23,067 for the month of January 2007 and a smaller profit of $43,886 for the month of February 2007. Bank's Exhibit 11. Remarkably, from March 2007 to July 2007, the number reported by the Debtor for January 2007 went from a profit of $64,853 to a loss of $23,067. 9/18/07 Transcript at pp. 33-37. Also, the July 27, 2007 report showed a loss of $72,427 for the month of June 2007. Bank's Exhibit 11.

On August 30, 2007, the Debtor provided the Bank with its financial information through July 31, 2007. The number reported for the prior month of June 2007 had changed drastically. The number reported by the Debtor for June 2007 fell from a loss of $72,427 to a loss of $209,576, a loss approximately 65% greater than reported to the Bank one month earlier. In addition, the Debtor continued to lose money during the month of July 2007 in the amount of $100,313. 9/18/07 Transcript at pp. 38-39; Bank's Exhibit 12.

Approximately a week later, on the Petition Date of September 4th, the Debtor produced to the Bank its financial information showing the actual numbers through July 31, 2007, and its projections through September 2008. Now, the profit for the month of February 2007 is back up to $57,246 (as reported on March 27, 2007), and the loss for June 2007 is back down to $72,427 (as reported on July 27, 2007). 9/18/07 Transcript at pp. 39-41; Bank's Exhibit 13. Also, on the Petition Date of September 4th, the Debtor projected total sales of $572,175 for the month of August 2007, and a monthly operating loss of $78,405. Bank's Exhibit 13.

In October, during the course of the ongoing Bankruptcy Court hearing, the Debtor finally provided to the Bank its financial information for the month of August 2007.[5] The reported actual loss for August 2007 was $260,369, as compared to the prior projected loss of $78,405 made by the Debtor on the Petition Date. Moreover, the total sales were $468,444, approximately $100,000 less than previously reported on the Petition Date. 10/04/07 Transcript at pp. 66-67.

On the other hand, the Debtor deposited $733,978 into its Bank operating account during the month of August 2007, the majority of which was collected accounts receivable. 9/19/07 Transcript at pp. 56-57; Bank's Exhibit 16. Thus, the Debtor admitted that during the month of August 2007, the total amount of receivables collected and ultimately spent by the Debtor was greater than the amount of sales generated to replace those receivables. 9/19/07 Transcript at p. 57. Therefore, the total outstanding accounts receivable reported by the Debtor in the amount of $1,143,716 as of August 31, 2007, had dropped markedly from the sum of $1,427,132 as of July

---

[5] It is important to take notice that from the Petition Date of September 4th, through the entire month of September 2007, the Debtor could only provide actual financial information through July 31, 2007 for consideration by the Bank and the Bankruptcy Court during the cash collateral hearing, which information was already "stale." Then again, in October, the Debtor provided stale financial information through August 31, 2007. The extreme time delay in the Debtor's ability to ascertain and provide its real numbers forces the Debtor to make ongoing business decisions based upon stale information.

31st that was previously reported to the Bank. Debtor's Exhibit 1; Bank's Exhibit 23. Consequently, based upon the Debtor's own financial documentation, the Debtor burned through the Bank's cash collateral in the amount of approximately $283,000 during the month of August 2007. In addition, by August 31, 2007, there was a substantial increase in the percentage of receivables over 90 days. In just one month, the receivables over 90 days increased by 12%. Debtor's Exhibit 1; Bank's Exhibit 23. **Clearly, the Debtor could not maintain a stable level of receivables, and the odds of the Debtor actually collecting those outstanding receivables were getting worse as time went on.**

Furthermore, commencing on the Petition Date of September 4th, the Bank tracked the daily activity of the Debtor's operating and payroll accounts, and the combined cash balance at the end of each day. As of the Petition Date, the combined cash balance totaled $115,656, and only eleven (11) days later on September 19, 2007, it had decreased to $78,834. 9/21/07 Transcript at p. 96; Bank's Exhibit 22. By September 21, 2007, the post-petition combined cash balance fell even further to $65,121, a total loss of $50,535 in a little over Two (2) weeks. 9/21/07 Transcript at pp. 97-98. **Thus, the Debtor was operating post-petition on an ongoing cash deficit basis, *i.e.* more evidence that the Debtor could not maintain stability.**

D. THE BANKRUPTCY COURT'S DECISION

Despite all of the evidence set forth above, on October 5, 2007, the Bankruptcy Court entered the final Cash Collateral Order which authorized the Debtor to use the Bank's cash collateral post-petition to finance the Debtor's futile business operations, without providing adequate protection to the Bank for the ongoing use of its secured property. In its adequate protection analysis, the Bankruptcy Court used inconsistent valuation standards to determine the amount of the Bank's collateral, *i.e.* it utilized both fair market value and liquidation value, in

finding that the Bank "is adequately protected, over secured, and that there exists a sufficient equity cushion." Cash Collateral Order at p. 4. The Court ultimately determined that the total value of the collateral assets securing the Indebtedness to the Bank was $2,578,700, based upon the following:

1. The stipulated *fair market value* of the Property is $2,200,000;

2. The value of the Debtor's accounts receivable was treated as zero;

3. The *liquidation value* of the particular machines & equipment appraised by Mr. Shapiro is $253,700 (Debtor's Exhibit 5); and

4. The *liquidation value* of the Debtor's vehicles ($75,000) and inventory ($50,000) appraised by Mr. Ponte is $125,000 (9/19/07 Transcript at pp.94-96; 9/21/07 Transcript at pp.12, 14, 16-19, 26; Debtor's Exhibit 2).

*See* Cash Collateral Order at p. 4. Thus, an equity cushion of only $78,700 (3%) was found to be sufficient adequate protection by the Bankruptcy Court. In further support of its conclusion, the Bankruptcy Court referred to and relied upon a Bank document dated June 18, 2007, wherein the Bank's collateral position was analyzed and valued at an amount greater than the Indebtedness. (Debtor's Exhibit 4 marked for identification only). *See* Cash Collateral Order at p. 5.

As more fully explained herein, the Bankruptcy Court made clearly erroneous findings of fact and wrong conclusions of law in the Cash Collateral Order based upon the totality of the evidence in the record. Most importantly, the Court rejected the Bank's argument that under the circumstances of this case, the *liquidation value* of the Property must be used. Consequently, the Bank timely filed a Notice of Appeal to this District Court on October 15, 2007.

## V. ARGUMENT

### A. APPLICABLE LAW

Section 363 of the Bankruptcy Code governs the post-petition use, sale or lease of property of the Debtor's estate. 11 U.S.C. §363. Section 363(c)(2) provides, in part, that a

debtor-in-possession authorized to operate under §1107 and §1108 "may not use, sell or lease cash collateral...unless – (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. §363(c)(2). Furthermore, a secured creditor whose cash collateral is subject to being used by the debtor has the right to demand that the court provide adequate protection to the secured party in exchange for the debtor's right to use the cash collateral. 11 U.S.C. §363(e). Thus, upon the request of a secured creditor, "the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection" of the secured party's interest. *Id.* Section 361 of the Bankruptcy Code provides some nonexclusive examples or means of adequately protecting a secured creditor's interest to insure that the creditor receives in value essentially what it bargained for pre-petition. Importantly, in connection with any hearing under §363, the debtor-in-possession has the burden of proof to show that the secured creditor is adequately protected. 11 U.S.C. §363(p).

"To determine whether an entity is entitled to adequate protection and the type and amount of adequate protection required, a court must determine the value of the collateral, the creditor's interest in the collateral and the extent to which that value will decrease during the course of the bankruptcy case." *In re Megan-Racine Associates, Inc.*, 202 B.R. 660, 663 (Bankr.N.D.N.Y. 1996) (citation omitted). Thus, the "equity cushion" test is <u>not</u> the sine-qua-non in an adequate protect determination. *Id.*; *In re Dynaco Corporation*, 162 B.R. 389, 395 (Bankr.D.N.H. 1993) (the concept of adequate protection also requires a determination of the future stability of the value of the cash collateral from the date the case was commenced, rather than any particular level of value at any one time) (citation omitted); *In re Smithfield Estates*, 48 B.R. 910, 914 (Bankr.D.R.I. 1985) (adequate protection relates to the debtor's ability to maintain

the status-quo after the filing of the petition so that the secured creditor is protected from depreciation or diminution in the value of its collateral as it existed on the petition date).

B. THE BANKRUPTCY COURT ERRED IN ALLOWING THE DEBTOR TO USE THE BANK'S CASH COLLATERAL AS A RESULT OF ITS FINDING THAT NO ADEQUATE PROTECTION TO THE BANK WAS NECESSARY BECAUSE THE BANK HAD A SUFFICIENT "EQUITY CUSHION" IN THE COLLATERAL ASSETS OF THE DEBTOR.

1. A Liquidation Value Should Have Been Applied to All of the Debtor's Assets Securing the Indebtedness.

The Bankruptcy Court improperly valued the collateral assets securing the Indebtedness due to the Bank from the Debtor. First and foremost, in determining the value of the Debtor's assets for §363 adequate protection purposes, the ***net liquidation value*** is the proper standard that should have been used in this case (*i.e.*, the sum that would likely be obtained by the Bank from the sale of the Debtor's assets and the Property if the Bank foreclosed upon and sold its security in a commercially reasonable manner, minus the hypothetical costs of sale). *See In re Demakes Enterprises, Inc.*, 145 B.R. 362, 365 (Bankr.D.Mass. 1992) (where debtor desired to keep using its meat processing plant, bankruptcy court utilized the real property valuation standard applied in the cases of *Ledgemere*, *Robbins*, and *T.H.B. Corporation*, *infra.*); *In re Ledgemere Land Corporation*, 125 B.R. 58, 61-62 (Bankr.D.Mass. 1991) (because debtor did not wish to sell certain real property, the bank's mortgage thereon was considered to be worth only what the property would bring in a foreclosure); *In re Robbins*, 119 B.R. 1, 4-5 (Bankr.D.Mass. 1990) (unless a private sale of the property at fair market value is a substantial possibility, the value of a mortgage interest is what the property will bring at a commercially reasonable foreclosure); *In re T.H.B. Corporation*, 85 B.R. 192, 195-196 (Bankr.D.Mass 1988) (Where there is no reasonable prospect of the secured creditor actually obtaining the going concern value of the collateral through a contemplated sale, the fact that a debtor is still operating its business is

insignificant.). *See also In re Stony Creek Technologies, LLC*, 364 B.R. 882 (Bankr.E.D.Pa. 2007) (In connection with a similar §364(d) adequate protection analysis, the court rejected the going concern value placed upon the real estate and improvements by the Debtor's experts in light of the dim prospects for reorganization. The court felt that the going concern value did not provide "a valid sense of what would be realized in a forced sale which would be the likely disposition in this case.")

In this matter, the Debtor intends to continue to utilize the Property in its business operations during its attempt to reorganize. To fulfill the intended purposes of adequate protection (*i.e.*, to preserve the benefits of the pre-petition secured creditor's bargain), the Bankruptcy Court should have valued the collateral assets in the light most favorable to the Bank, analyzing the effects of the Debtor's proposed post-petition operations on the Bank's collateral under a worst case scenario, *to wit*, the Debtor fails to reorganize and is forced to liquidate its assets. Under that circumstance, the only realistic way by which the Bank will collect on its security interest in the Property is through foreclosure proceedings and sale of the Property at public auction in accordance with state law. Therefore, the ***liquidation value*** of the Property should have been used. *See Demakes, Ledgemere, Robbins, T.H.B. Corporation, Stony Creek, supra.*

Consequently, the Bankruptcy Court incorrectly used the fair market value of the Property in its adequate protection analysis. Indeed, even though the Bankruptcy Court acknowledged that the fair market value standard assigned to the debtor's assets in the First Circuit case of *In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72 (1st Cir. 1995), was done so by that court in a totally different and unrelated §506(b) context,[6] nevertheless, the Bankruptcy

[6] In *Winthrop*, a fair market value was applied to the debtor's property in the context of the court having to make a determination under 11 U.S.C. §506(b) of the proper classification of a lender's secured claim in a proposed Chapter

Court relied upon *Winthrop* and erroneously applied the fair market value to the real Property in this case. *See* Cash Collateral Order at p. 4. As stated in *T.H.B. Corporation,* the Legislative history of §506 makes it clear that "a valuation in one setting would not be binding upon a valuation in another." *Id.*, 85 B.R. at 196. *See also In re Gould*, 348 B.R. 78, 80 (Bankr.D.Mass. 2006) (court used the liquidation value of mortgaged property in the context of a request for relief from the automatic stay, recognizing a distinction from the §506(b) circumstances presented in *Winthrop, supra.*).

Second, the Bankruptcy Court incorrectly included the value of the Debtor's motor vehicles ($75,000) in its collateral asset calculation. The Indebtedness owed to the Bank is <u>not</u> secured by any of the Debtor's vehicles, and this amount should have been excluded from the adequate protection analysis.

Finally, the Bankruptcy Court's third collateral valuation error was that it referred to and relied upon the contents of a document (Debtor's Exhibit 4 marked for identification) that was <u>never</u> actually admitted into evidence as a full exhibit during the course of the cash collateral hearing before the Bankruptcy Court.[7] Indeed, the Federal Rules of Evidence still apply to proceedings held in the Bankruptcy Court. *See* Rule 9017 of the Federal Rules of Bankruptcy Procedure; Rule 1101(b) of the Federal Rules of Evidence. Furthermore, the value of the Property set forth in that document was the fair market value, <u>not</u> the liquidation value which should have been used in the adequate protection analysis. Consequently, the Bankruptcy Court's reliance upon the Debtor's proposed Exhibit 4 was <u>clearly</u> <u>erroneous</u>.

---

11 plan of reorganization, and consequently, the *Winthrop* case is inapposite because it had nothing to do with an adequate protection analysis under §363 or §364.

[7] On October 25, 2007, counsel for the Bank conferred with Jonathan Calianos of the Bankruptcy Court regarding which of the Debtor's Exhibits were marked for identification but <u>not</u> admitted in full during the course of Bankruptcy Court hearing. Mr. Calianos confirmed that according to the Bankruptcy Court's hearing records, only four of the Debtor's Exhibits had been admitted into evidence as <u>full</u> Exhibits, *i.e.* Debtor's Exhibits 1, 2, 5 & 7.

2. When the Proper Standard of Valuation (Liquidation Value) is Utilized in the §363 Adequate Protection Analysis, There is No Equity Cushion.

If liquidation values are uniformly assigned to the collateral assets, there is **no equity cushion**. The Bankruptcy Court found that the liquidation value of the Debtor's machines & equipment ($253,700) and inventory ($50,000) totals approximately $303,700. Arguably, because the Bank presented so much evidence establishing that the financial reports generated by the Debtor pertaining to the value of its accounts receivable are so flawed and unreliable, the Bankruptcy Court correctly decided that it should treat the value of the Debtor's receivables as zero. Most significant is the fact that the Debtor failed to provide any evidence of the liquidation value of the Property. The Debtor chose to place all of its eggs in the fair market value basket instead of providing the Court with evidence of both values for the Property. It is critical to keep in mind that pursuant to 11 U.S.C. §363(p), it is the Debtor, not the Bank, who has the burden of proof on the issue of adequate protection. The Debtor is required to put forth sufficient evidence to show that the Bank is adequately protected. Thus, it was the Debtor's burden to put forth evidence of the Property's liquidation value for the Bankruptcy Court's consideration, which the Debtor failed to do. Consequently, the collateral asset values in evidence that were properly considered by the Bankruptcy Court totaled approximately $303,700, far short of the Debtor's $2.5 Million Indebtedness to the Bank.[8]

[8] Note that during a subsequent hearing in this matter on Debtor's Motion to Obtain Postpetition Credit on a Secured Basis under 11 U.S.C. §364(d), the Bank provide evidence to show that the liquidation value of the Property is approximately $1,500,000. If that liquidation value were included by the Bankruptcy Court in the §363 adequate protection calculation, the total collateral value of $1,803,700 ($303,700 + $1,500,000) would have resulted in no equity cushion.

Furthermore, even assuming, *arguendo*, that the Bankruptcy Court correctly used the fair market value of $2,200,000 for the Property in its calculation, the total collateral value would be $2,503,700 ($303,700 + $2,200,000), an amount virtually equal to the $2.5 million Indebtedness and insufficient to constitute an equity cushion.

3. The Overwhelming Evidence Established That the Debtor Cannot Maintain Stability During its Attempt to Reorganize.

Finally, courts have held that the existence of an equity cushion alone should not be determinative in an adequate protection analysis. An equity cushion is only one factor. *See, e.g., In re Megan-Racine Associates, Inc.*, 202 B.R. at 663-664 (for a debtor to avoid the need to provide additional protection to the secured creditor, **there must be a continuous income stream being generated by the debtor and the value of that collateral must not be declining, *i.e.* the evidence must show that the debtor can at least maintain stability**) (citing *In re Mullen*, 172 B.R. 473, 477 (Bankr.D.Mass. 1994)).

As demonstrated by the evidence detailed above, the Debtor cannot maintain stability. The Debtor lost money during the months of July 2007 in the amount of $100,313, and August 2007 in the amount of $260,369. 9/18/07 Transcript at pp. 38-39; 10/04/07 Transcript at pp. 66-67; Bank's Exhibit 12. The Debtor projected that it would continue to lose money during the months of September and October of 2007. Bank's Exhibit 13.

In addition, the Debtor reported total sales as of August 31, 2007, as being $468,444. 10/04/07 Transcript at pp. 66-67. On the other hand, the Debtor deposited $733,978 into its Bank operating account during the month of August 2007, the majority of which was collected accounts receivable. 9/19/07 Transcript at pp. 56-57; Bank's Exhibit 16. Thus, the Debtor admitted that during the month of August 2007, the total amount of receivables collected and completely spent by the Debtor was greater than the amount of new sales generated to replace those receivables. 9/19/07 Transcript at p. 57. As a result, the Bank's cash collateral would inevitably deteriorate. In fact, the total outstanding accounts receivable reported to the Bank by the Debtor in the amount of $1,427,132 as of July 31, 2007, dropped to the sum of $1,143,716 by August 31, 2007. Debtor's Exhibit 1; Bank's Exhibit 23. Consequently, based upon the

Debtor's own financial documentation, the Debtor burned through the Bank's cash collateral in the amount of approximately $283,000 during the month of August 2007. Again, the Debtor admitted to the Bankruptcy Court that it would continue to operate at a loss during the months of September and October 2007, which means a further erosion of the Bank's cash collateral in the amount of approximately $200,000 to $300,000 per month from the Petition Date. Thus, Debtor could not even show that it would operate at a break even point.

More importantly, by August 31, 2007, there was a substantial increase in the percentage of outstanding receivables over 90 days. In just one month from July 31st to August 31st, the amount of receivables over 90 days increased by 12%. Debtor's Exhibit 1; Bank's Exhibit 23. **Clearly, the Debtor can not maintain a stable level of receivables, and the odds of the Debtor actually collecting those outstanding receivables were getting worse as time went on.**

Finally, commencing on the Petition Date of September 4th, the Bank tracked the daily activity of the Debtor's operating and payroll accounts, and the combined cash balance at the end of each day. As of the Petition Date, the combined cash balance totaled $115,656, and only eleven (11) days later on September 19, 2007, it had decreased to $78,834. 9/21/07 Transcript at p. 96; Bank's Exhibit 22. By September 21, 2007, the post-petition combined cash balance fell even further to $65,121, a total loss of $50,535 in a little over Two (2) weeks. 9/21/07 Transcript at pp. 97-98. **Thus, the Debtor was operating post-petition on an ongoing cash deficit basis, *i.e.* more evidence that the Debtor could not maintain stability.**

## VI. CONCLUSION

Based upon all of the reasons set forth above, the Bank respectfully requests that this Court reverse and vacate the Cash Collateral Order entered by the Bankruptcy Court.

Respectfully submitted,

BANK RHODE ISLAND
By its Attorneys,

/s/ Denean M. Russo
Robert D. Wieck, Esq. #1739
Attorney Denean M. Russo #5043
MacAdams Wieck DeLuca & Gemma Inc.
101 Dyer Street, Suite 400
Providence, Rhode Island 02903
(401) 454-8700
(401) 454-8755 (facsimile)
Dated: December 14, 2007

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the within Appellant's Brief was served by electronic mail through the Federal District Court's Electronic Case Filing system on the 14th day of December, 2007, to the following counsel:

Andrew S. Richardson, Esq.
Steven J. Boyajian, Esq.
Boyajian Harrington & Richardson
andy@bhrlaw.com
steve@bhrlaw.com

Joseph P. Ferrucci, Esq.
Ferrucci Russo P.C.
jferrucci@frlawri.com

Leonard J. DePasquale, Esq.
Assistant United States Trustee
ustpregion01.pr.ecf@usdoj.gov

I hereby certify that on this 14th day of December, 2007, a true copy of the within Appellant's Brief was forwarded via first class mail, postage prepaid, to the following:

Attorney Carol Ann Slocum
Klehr Harrison Harvey Branzburg & Ellers
457 Haddonfield Road, Suite 510
Cherry Hill, NJ 08002-2220

/s/ Denean M. Russo